RPD:JGM:jgm
F. #2003R01830

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

        - against -

DAVID H. BROOKS and
SANDRA HATFIELD,

            Defendants.

- - - - - - - - - - - - - - - X

<table>
<tr><td>I N D I C T M E N T</td></tr>
</table>

Cr. No. 06-550 (S-2)(JS)
(T. 15, U.S.C., §§
78m(a) and 78ff;
T. 18, U.S.C., 1341,
1343, 1348,
1349, 1512(c)(2),
1512(k), 2
and 3551 et seq.

THE GRAND JURY CHARGES:

INTRODUCTION

        At all times relevant to this Superseding Indictment,
unless otherwise indicated:

I.   Background

    A.   The Companies

        1.   D.H.B. Industries, Inc. ("DHB") was incorporated
in New York in 1992 under the name D.H.B. Capital Group, Inc.  In
1995, DHB re-incorporated in Delaware and ceased to be a New York
corporation.  In 2001, DHB changed its name to D.H.B. Industries,
Inc.  DHB operated from a corporate headquarters located, at
different times, at various addresses in Nassau County, New York.

        2.   DHB and its corporate subsidiaries, which included
Point Blank Body Armor, Inc. ("Point Blank") and Protective
Apparel Corporation of America, Inc. ("PACA"), manufactured and

sold body armor. A third DHB subsidiary, NDL Products, Inc. ("NDL"), manufactured protective athletic products, such as pads, bandages and braces. Point Blank and NDL were located in Florida and PACA was located in Tennessee. DHB's primary customers were branches of the United States Military and various federal and state law enforcement entities located throughout the United States.

3. DHB was a publicly traded corporation, the common stock of which was initially traded on the "Over the Counter" ("OTC") market under the trading symbol "DHBT" and on the Boston Stock Exchange under the trading symbol "DHB," from September 1993 until 1998. In 1998, DHB was listed on the North American Securities Dealers Association Quotation system ("NASDAQ") Small Cap Exchange. In 1999, DHB was delisted by NASDAQ and was again traded on the OTC market until 2002, when DHB was listed on the American Stock Exchange ("AMEX") under the trading symbol "DHB." In 2005, DHB was delisted from the AMEX and was again traded on the OTC market under the trading symbol "DHBT." DHB's shareholders were located throughout the United States, including in the Eastern District of New York.

4. Tactical Armor Products, Inc. (TAP") was a privately owned company which supplied sewing services and armored plates to Point Blank and PACA. Point Blank and PACA were TAP's only customers. In 2003, Point Blank and PACA

purchased more than $29 million dollars worth of goods and services from TAP, generating more than $9 million in profit for TAP.

     B.   <u>The Defendants</u>

         <u>DAVID H. BROOKS</u>

     5.   The defendant DAVID H. BROOKS was the founder of DHB and the Chairman or Co-Chairman of the DHB Board from its inception until July 2006.  BROOKS also served as the DHB Chief Executive Officer ("CEO") from its inception until 1998, and again from 2000 until July 2006.  BROOKS held a Bachelor's Degree in accounting.  During his tenure at DHB, BROOKS maintained offices at DHB's various New York headquarters.  BROOKS also maintained offices at his two residences, one located in Old Westbury, New York, and one located in Boca Raton, Florida. BROOKS left DHB in July 2006.

     6.   In addition to DHB, during the period from July 2000 to July 2006, the defendant DAVID H. BROOKS privately owned or controlled more than 30 corporate entities, including Brooks Industries of Long Island, Perfect World Enterprises, L.L.C., Corniche Capital, L.L.C., Wildfire Holdings, L.L.C., Vianel Industries, VAE Enterprises, L.L.C., RSJ Industries, Inc., and True Grit Holdings.  Some of these entities existed solely for the purpose of opening bank and brokerage accounts, or for tax planning purposes.  Others, however, such as VAE Enterprises and

RSJ Industries, owned valuable property, including the Point Blank manufacturing facility leased by DHB, and a Learjet aircraft which BROOKS used for both personal and business travel.

7.    During the period from July 2000 to July 2006, the defendant DAVID H. BROOKS also managed more than 25 active stock market trading accounts, and controlled more than 30 bank accounts, some of which were held in the names of the corporate entities described above or in the names of various nominees, including BROOKS' family members.

8.    The defendant DAVID H. BROOKS was also a member of the United States Trotting Association ("U.S.T.A.") and his biography was included on the U.S.T.A. website under a list of the sport's leading owners.  BROOKS or companies he owned or controlled held title to approximately 100 trotting horses and breeding horses.  BROOKS spent millions of dollars each year training, housing, transporting, racing and caring for his fleet of racehorses and breeding horses, and he was intimately involved in the management of the business.  DHB had no interest in or connection to BROOKS' horse business.

9.    Beginning in April 2000, the defendant DAVID H. BROOKS also oversaw the operation of TAP.  Although nominally established and owned by BROOKS' elderly mother and his brother, and later nominally owned by BROOKS' wife, in fact, all significant management and financial decisions regarding TAP were

made by BROOKS or other DHB employees.  BROOKS and DHB personnel

hired the TAP employees and BROOKS set the prices that TAP

charged Point Blank and PACA.  BROOKS controlled the assets of

TAP and authorized all significant capital expenditures by TAP.

BROOKS and other DHB employees signed certain TAP checks.

<u>SANDRA HATFIELD</u>

10.  The defendant SANDRA HATFIELD was employed by

Point Blank beginning in 1995.  In October 1996, HATFIELD became

the President of Point Blank.  In 2000, HATFIELD became the DHB

Chief Operating Officer, a position she held until approximately

August 2005.  HATFIELD left DHB in November 2005.

C.   <u>Certain Relevant Accounting and Finance Principles</u>

11.  As a public company, DHB was required to comply

with the rules and regulations of the United States Securities

and Exchange Commission (the "SEC"), an agency of the federal

government authorized by law.  The SEC's rules and regulations

were designed to protect members of the investing public by,

among other things, ensuring that a company's financial

information was accurately recorded and disclosed to the

investing public.

12.  Under the SEC's rules and regulations, DHB and

its officers were required to: (a) make and keep books, records

and accounts which, in reasonable detail, fairly and accurately

reflected the company's business transactions, including its

revenues and expenses; (b) devise and maintain a system of internal accounting controls sufficient to provide reasonable assurance that the company's transactions were recorded as necessary to permit preparation of financial statements in conformity with Generally Accepted Accounting Principles ("GAAP"); (c) file with the SEC quarterly reports (on Form 10-Q) and annual reports (on Form 10-K) that included financial statements that accurately presented DHB's financial condition and the results of its business operations in accordance with GAAP; and (d) file with the SEC any proxy statements distributed to shareholders relating to the annual election of members of the DHB Board, and ensure that any proxy statements accurately presented DHB's financial condition and the results of its business operations in accordance with GAAP.

13.   SEC regulations also required DHB to disclose, in its annual report on Form 10-K, in clear, concise and understandable terms, all compensation earned by or paid to the CEO as well as the next four most-highly compensated officers of the corporation, provided their total compensation exceeded $100,000.   Included within the definition of compensation for which clear, concise and understandable disclosure was required were perquisites and other personal benefits, if the aggregate value of such compensation exceeded $50,000 and 10% of such person's bonus and salary.   SEC regulations further required the

disclosure of any transaction between DHB and a "related party,"
meaning any transaction between DHB and: (a) any officer or
director of DHB; or (b) any holder of more than 5% of DHB's
publicly traded stock; or (c) any member of such person's family,
including their spouse, child, parent and sibling, provided that
the amount involved in the related party transaction exceeded
$60,000.  From July 2000 through July 2006, the defendant DAVID
H. BROOKS was the CEO and a director of DHB, and owned more than
5% of DHB's publicly traded stock.  During that same period, the
defendant SANDRA HATFIELD was the second highest paid officer of
DHB, with compensation in excess of $100,000.  As such, DHB's
quarterly and annual reports, as well as its proxy statements,
contained disclosures purporting to reflect the compensation paid
to the defendants DAVID H. BROOKS and SANDRA HATFIELD, and
contained disclosures purporting to describe all "related party"
transactions.

14.  "Gross profit margin" was a term often used by
market analysts and investors in evaluating how efficiently a
manufacturer like DHB produced its goods.  The term "gross profit
margin" referred to the difference between a company's revenues
from the sale of its goods and the cost of producing those goods.
The term did not include costs associated with the actual sale of
goods, such as, for example, the cost of providing free samples

to customers, general administrative expenses, such as executive salaries, or the cost of research and development.

II. <u>The Fraudulent Schemes: Securities, Mail and Wire Fraud, Lying to Auditors, Obstruction of the SEC Investigation, and the False Proxy Statement</u>

15. Between July 2000 and July 2006, the defendants DAVID H. BROOKS and SANDRA HATFIELD, together with others, devised and carried out a variety of fraudulent schemes designed to defraud DHB shareholders and the investing public by materially misrepresenting DHB's gross profit margins, performance, revenues, expenses, earnings and inventory, and by concealing related party transactions and compensation provided to BROOKS, HATFIELD and their family members. The ultimate goals of the schemes were to enrich BROOKS and HATFIELD by deceiving DHB shareholders and the investing public, abusing their positions of trust at DHB and preventing independent auditors or the SEC from detecting the schemes.

A. <u>Overstatement of Gross Profit Margins, Inventory and Earnings</u>

16. The defendants DAVID H. BROOKS and SANDRA HATFIELD, together with others, devised and carried out a scheme to defraud the investing public by overstating, and thereby materially misrepresenting, DHB's quarterly and annual gross profit margins, inventories and earnings reported on Forms 10-Q and 10-K. As is set forth in greater detail herein, the scheme involved the following components: (a) the use of fraudulent

journal entries to reclassify expenses associated with the cost of producing goods as being related to research and development, samples, or other expenses which did not impact DHB's gross profit margin; (b) the overvaluation of DHB's inventory and inflation of its earnings; and (c) the creation of fraudulent entries in DHB's corporate books and records that accounted for non-existent inventory. The goal of this scheme was to ensure that DHB consistently reported gross profit margins of 27 percent or more and increased earnings, to correspond to the expectations of professional stock analysts.

<u>The Reclassification of Point Blank's Expenses</u>

17.   Between 2003 and 2005, accounting personnel at Point Blank regularly compiled preliminary quarterly reports. The reports reflected, among other things, Point Blank's revenues, expenses and inventory calculations. The reports were provided to the defendant SANDRA HATFIELD. Point Blank was the largest of DHB's subsidiaries and, as such, its financial results had the greatest impact on DHB's overall financial results. Point Blank's quarterly financial results were included in consolidated financial statements for DHB that summarized the quarterly financial results of all of DHB's subsidiaries and they were included in DHB's quarterly reports on Form 10-Q and annual reports on Form 10-K.

18.   Professional stock analysts generally expected

DHB's gross profit margin to be approximately 27 percent to 28 percent. Prior to the finalization of DHB's quarterly financial reports, the defendant SANDRA HATFIELD reviewed Point Blank's preliminary quarterly reports. In any period in which Point Blank's quarterly financial results caused DHB's gross profit margin to fall below 27 percent, HATFIELD provided the Chief Financial Officer of DHB with fraudulent adjustments to the reports which she claimed were required. Thereafter, the defendant DAVID H. BROOKS, knowing that the adjustments were not accurate, approved of the changes. DHB's Chief Financial Officer then directed Point Blank's various controllers to make the fraudulent entries in Point Blank's books and records. These fraudulent entries reclassified expenses associated with the costs of producing goods as being related to research and development, samples or other expenses that did not impact Point Blank's or DHB's gross profit margins. Those reclassifications of expenses consistently brought DHB's total gross profit margin above 27 percent.

## The Overvaluation of Inventory

### Point Blank's Inventory at PACA

19. In 2004, Point Blank entered into a contract with PACA to sew vest components. From December 31, 2004 through the first week of January 2005, PACA and Point Blank employees prepared a schedule of Point Blank's inventory of vest components

that were located at PACA so that the inventory could be included in Point Blank's annual inventory calculation. The schedule valued Point Blank's inventory at PACA at approximately $2 million. After the schedule was provided to the defendant SANDRA HATFIELD, she and Patricia Lennex fraudulently revised it and increased the value of Point Blank's inventory at PACA to approximately $9 million.

20. By fraudulently inflating the value of Point Blank's inventory at PACA, the defendant SANDRA HATFIELD, Patricia Lennex and others (a) increased DHB's pre-tax earnings in the fourth quarter of 2004 from approximately $5 million to $12 million; (b) increased DHB's 2004 fourth quarter gross profit margin from approximately 20 percent to 27 percent; (c) increased DHB's pre-tax earnings for the fiscal year 2004 from approximately $41 million to $48.2 million; and (d) contributed to the increase of DHB's gross profit margin for the fiscal year 2004 from approximately 21 percent to 28 percent.

<u>Interceptor Vest Inventory</u>

21. Between 2003 and 2005, DHB's primary product was the "Interceptor" vest, an armored vest designed to withstand penetration by pistol and rifle ammunition, as well as explosive shrapnel fragments. DHB produced the Interceptor vest for various branches of the United States Military, including the United States Marines, the United States Army and the United

States Navy. In the latter half of 2004, John Doe #2, a DHB employee whose identity is known to the Grand Jury, determined that DHB was overvaluing its Interceptor vests inventory. Beginning in November 2004, John Doe #2 repeatedly informed the defendant SANDRA HATFIELD that the Interceptor vests inventory was overvalued by $6 million to $8 million. In February 2005, HATFIELD told John Doe #2 that she would not change the Interceptor vests inventory valuation in the books and records of Point Blank, and directed John Doe #2 to have no contact with DHB's auditors regarding issues related to the valuation of Point Blank's inventory. On or about February 18, 2005, John Doe #2 informed HATFIELD that he was resigning from DHB, in part, because of the Interceptor vests inventory overvaluation. HATFIELD acknowledged to John Doe #2 that DHB's Interceptor vests inventory was overvalued, but told John Doe #2 that DHB could not "take the hit" by reducing the valuation to the correct amount in the year 2004. HATFIELD told John Doe #2 that the value of the Interceptor vests would be corrected at some point in 2005.

22. The day before John Doe #2 resigned from DHB, he spoke to accountants from DHB's independent auditor. John Doe #2 relayed to the accountants some of his concerns regarding DHB's inventory valuation, although he provided little detail. One week before John Doe #2's last scheduled day of work at DHB, the defendant DAVID H. BROOKS confronted John Doe #2 at the Point

Blank facility and screamed, among other things, that John Doe #2 was a "f___ing snake." BROOKS threatened John Doe #2, telling him that, when he attempted to get a new job, BROOKS would tell John Doe #2's prospective employer what a "f___ing snake" he was.

23. The overvaluation of the Interceptor vests inventory in fiscal year 2003 inflated DHB's pretax earnings from approximately $19.6 million to $26.2 million and contributed to the increase in DHB's gross profit margin from approximately 21 percent to 28 percent. The overvaluation of Point Blank's Interceptor vests inventory in fiscal year 2004 resulted in the inflation of DHB's pretax earnings for 2004 by approximately $6.8 million, contributed to a fraudulent increase in pretax earnings from approximately $34.4 million to $48.2 million and contributed to the increase in DHB's gross profit margin for 2004 from approximately 21 percent to 28 percent.

<u>Non-existent Inventory</u>

24. In or about April 2005, prior to the filing of DHB's quarterly report on Form 10-Q for the first quarter of 2005, the defendants DAVID H. BROOKS, SANDRA HATFIELD and others received financial information indicating that DHB's earnings and gross profit margins were far below the predictions of professional stock analysts for the first quarter of 2005. BROOKS and HATFIELD, together with others, concealed these shortfalls by causing a fraudulent entry to be created in Point

Blank's books and records that showed the existence in Point
Blank's inventory of 62,975 Interceptor vest outer shell
components, valued at approximately $7 million ("the non-existent
vest components"). The inclusion of the non-existent vest
components in Point Blank's inventory increased DHB's pretax
earnings for the first quarter of 2005 from approximately $5
million to $12 million, and increased DHB's gross profit margin
for the first quarter of 2005 from approximately 18 percent to 27
percent.

25. The non-existent vest components remained
in Point Blank's inventory, as reported in Point Blank's books
and records and in DHB's quarterly report on Form 10-Q for the
second quarter of 2005, until September 2005. In September 2005,
DHB discontinued sales of products containing Zylon. Zylon was
no longer marketable as of September 2005 and DHB decided to
voluntarily replace vests containing Zylon that were previously
sold by DHB. As part of the Zylon vest replacement program, DHB
reduced the value of its inventory by $19.2 million to account
for vests containing Zylon. However, Zylon was not used in the
production of the Interceptor vests. Nevertheless, at the
direction of the defendant DAVID H. BROOKS, DHB employees
included the non-existent vest components as part of the
September 2005 Zylon inventory reduction. The inclusion of the
non-existent vest components in the Zylon inventory reduction

increased the amount of that reduction from approximately $12.2 million to $19.2 million, as reported in DHB's quarterly report on Form 10-Q for the third quarter of 2005.

      B.    Lying to Independent Auditors

      26.  In March 2006, accountants from DHB's independent auditor questioned the defendant DAVID H. BROOKS and others about the non-existent vest components portion of the Zylon inventory reduction.  In response to the accountants' inquiries, BROOKS and DHB personnel acting at the direction of BROOKS falsely told DHB's auditors that the non-existent vest components existed, contained Zylon, and were properly included in the Zylon inventory reduction.  They claimed, however, that the non-existent vest components were mistakenly classified as Interceptor vests because, even though they were not Interceptor vests, they closely resembled a particular model of Interceptor vest.  BROOKS later admitted to the accountants that the non-existent vest components did not contain Zylon, but falsely claimed that they were Interceptor vests that were included in the inventory reduction because the military modified the color of vest they required, thus rendering the vest components unmarketable.  BROOKS also falsely told the accountants that the unmarketable vests were not available for inspection because they had been destroyed in a hurricane.  Subsequently, after the accountants requested shipping documents to verify the transportation of the vests and evidence that they were in fact

destroyed, BROOKS and the defendant SANDRA HATFIELD admitted to

the accountants that the non-existent vest components did not

contain Zylon, were never actually observed, and were added to

DHB's inventory only after HATFIELD and others reviewed DHB's

financial information for the first quarter of 2005.

     C.   <u>Unauthorized and Undisclosed Executive Compensation</u>

       27.  The defendant DAVID H. BROOKS and SANDRA HATFIELD,

together with others, devised and carried out a scheme to defraud

the shareholders of DHB and the investing public by diverting

millions of dollars worth of DHB assets to the benefit of BROOKS,

his family, companies that BROOKS controlled, HATFIELD and

members of her family.  As is set forth in greater detail herein,

the scheme involved the following components: (a) the payment by

DHB or one of its subsidiaries of expenses related to BROOKS'

horse business; (b) the payment by DHB or one of its subsidiaries

of the personal expenses of BROOKS and his family, including

clothing, meals, jewelry purchases, housing expenses and

electronics equipment, made via check or wire transfer from the

bank accounts of DHB or one of its subsidiaries, or through the

use of one of several DHB American Express charge cards; (c)

BROOKS and his family's use of DHB funds to finance personal

trips and vacations; (d) BROOKS' receipt of compensation for

purportedly  "unused" vacation time; (e) BROOKS' use of DHB funds

to purchase or lease luxury vehicles for himself and his family

members; (f) BROOKS' use of DHB funds to pay bonuses to employees

of TAP, a non-DHB corporation he controlled; (g) BROOKS' use of DHB funds to purchase vehicles for use by BROOKS' non-DHB business interests; (h) disbursement of checks to HATFIELD's husband for the benefit of HATFIELD; and (i) concealment of BROOKS' de <u>facto</u> ownership of TAP and the unjust enrichment of BROOKS and TAP at the expense of DHB.

28.  This compensation to BROOKS and HATFIELD, totaling in excess of five million dollars, was not disclosed to DHB's shareholders or to the investing public, and it was not accounted for in the books and records of DHB or in DHB's disclosures to the IRS as income to BROOKS or HATFIELD.

<u>BROOKS' 2000 Employment Contract</u>

29.  In or about July of 2000, the defendant DAVID H. BROOKS and a representative of the DHB Board's Compensation Committee signed an employment agreement.  The agreement was for a term of five years and it provided that, in exchange for his service as DHB's Chief Executive Officer, BROOKS would be paid an annual salary of $500,000 with increases of $50,000 per year, and that he would receive a bonus of an option to purchase 750,000 shares of DHB stock each year at a price of $1 per share. BROOKS' 2000 employment agreement also provided that he was entitled to six weeks of paid vacation per year, that DHB would pay the business expenses related to BROOKS' use of his home office at in Old Westbury, New York, and that DHB would pay all expenses related to BROOKS' Florida condominium.  Finally, the

agreement entitled BROOKS to a car and driver in New York and
Florida.

Payment by DHB of the Expenses of BROOKS' Horse
Business

30.   During the period from July 2000 through July
2006, the defendant DAVID H. BROOKS caused DHB to pay more than
$1 million of the expenses of his personal horse business,
including trainers' salaries, the cost of feed and vitamins for
the horses, stable fees and veterinary and legal fees.  Those
payments were not authorized by BROOKS' employment contract, they
were not disclosed to DHB's shareholders or to the investing
public, and they were not accounted for in the books and records
of DHB or in DHB's disclosures to the IRS as income to BROOKS.
The compensation included, but was not limited to:

| DATE(S) and SOURCE(S) OF PAYMENT | AMOUNT OF PAYMENT | PURPOSE OF PAYMENT |
|---|---|---|
| July and September 2000 NDL Checks and Wires | $ 42,761 | Horse Medical Treatments |
| January - December 2000 DHB American Express Card | $106,062 | Horse Vitamins |
| January - December 2001 NDL and Point Blank Checks and Wires | $109,600 | BROOKS' Horse Trainer's Salary and Expenses |
| February 2002 Point Blank Check | $ 34,000 | Attorneys Representing BROOKS in Matter Regarding his Horse Business |
| January - December 2002 DHB Check | $  8,460 | BROOKS' Horse Trainer |

| DATE(S) and SOURCE(S) OF PAYMENT | AMOUNT OF PAYMENT | PURPOSE OF PAYMENT |
|---|---|---|
| December 2003 DHB Check | $ 10,000 | Bonus for BROOKS' Horse Trainer |
| July 2003 NDL Check | $ 10,000 | BROOKS' Horse Broker |
| December 2004 DHB Check | $ 20,000 | Bonus for BROOKS' Horse Trainer |
| December 2005 DHB Check | $ 10,000 | Bonus for BROOKS' Horse Trainer |

DHB's Payment of the Personal Expenses of BROOKS
and his Family and DHB Payments to HATFIELD's
Family

31.    During the period from July 2000 to July 2006, the
defendant DAVID H. BROOKS held a number of American Express
charge cards which were funded by DHB.  American Express cards
were issued to BROOKS in the name of each of DHB's subsidiaries,
Point Blank, PACA and NDL, as well as two cards in the name of
DHB.  The ostensible purpose of these cards was to aid BROOKS in
conducting DHB business, and to permit him to charge amounts
related to the legitimate business expenses of DHB and its
subsidiaries.  However, BROOKS used the cards not only for
expenses related to DHB business, but also for many of his
personal expenses.  In fact, BROOKS gave DHB American Express
charge cards or the card numbers to his wife and brother so that
they could use them for their personal expenses.

32.    During that period, the defendant DAVID H. BROOKS

also either personally wrote checks or directed DHB personnel to write checks to pay for BROOKS and his family's personal expenses, BROOKS' non-DHB business expenses, and to make undisclosed payments to the defendant SANDRA HATFIELD's husband. None of those payments were authorized by BROOKS' employment agreement, they were not disclosed to DHB's shareholders or to the investing public, and they were not accounted for in the books and records of DHB or in DHB's disclosures to the IRS as income to BROOKS or HATFIELD.

33.  The compensation included, but was not limited to:

| DATE(s) and SOURCE of PAYMENT(s) | APPROXIMATE AMOUNT | PURPOSE |
|---|---|---|
| July 27, 2000 and October 26, 2000 American Express Card | $20,000 | Leather Bound Invitations to BROOKS' Son's Bar Mitzvah |
| October 2000 Point Blank Body Armor Check | $16,000 | Photographer for BROOKS' Son's Bar Mitzvah |
| January to December 2001 American Express Card | $11,240 | Acupuncture Treatments for BROOKS' Family Members |
| October 2001 Point Blank Body Armor Check | $101,500 | Armored Vehicle for BROOKS and his Family Member's Personal Use |
| March 2002 NDL Check | $14,233 | Real Estate Tax Payment for BROOKS' Mother's Florida Condominium |
| May 2002 PACA Body Armor Check | $10,300 | Summer Camp for BROOKS' children |
| June 15, 2002 DHB American Express Card | $12,835 | Gold Bracelet with Diamonds |
| August 6, 2002 DHB American Express Card | $101,190 | Belt Buckle Studded with Diamonds, Rubies and Sapphires |
| August 23, 2002 DHB American Express Card | $3,119 | Electronics/Stereo Equipment for BROOKS' Child |
| July to December 2002 Point Blank Checks | $59,000 | Checks Written to HATFIELD's Husband |

| DATE(s) and SOURCE of PAYMENT(s) | APPROXIMATE AMOUNT | PURPOSE |
|---|---|---|
| January to December 2003 NDL Check | $18,098 | Condominium Charges for BROOKS' Mother's Residence |
| March 5, 2003 DHB American Express Card | $7,900 | Face Lift for BROOKS' Wife |
| September 19, 2003 DHB American Express Card | $12,400 | Boca Raton Resort and Country Club Bill |
| July to October 2003 DHB, NDL and PACA Checks | $66,500 | Deck Construction, Renovation of Pool House and Home Improvements at BROOKS' Old Westbury Residence |
| November 2003 Point Blank Check | $24,345 | Real Estate Taxes for BROOKS' Westbury Estate |
| January 30, 2004 American Express Card | $50,000 | Flat Screen Television Entertainment System for BROOKS' Home |
| January to November 2004 DHB Checks | $4,847 | BROOKS' and Family's Dry Cleaning Bills |
| December 2003 December 2004 December 2005 DHB Checks | $110,000 $180,000 $56,000 | Year-End Bonus Payments to Employees of TAP |
| November, 2005 DHB American Express Card | $122,000 | Purchase of Video i-pods and Digital Cameras to Distribute as Gifts at BROOKS' Daughter's Bat Mitzvah |

## Vacation Trips and the Learjet Aircraft

34.   During the period from July 2000 through July 2006, the defendant DAVID H. BROOKS financed his and his family's vacations with DHB funds.   While BROOKS and his family traveled to destinations including France, Italy, the Carribean, Las Vegas and California, BROOKS used a DHB charge card to purchase airplane tickets and to pay for hotels, meals and other expenses. Those payments were not authorized by BROOKS' employment agreement, were not disclosed to DHB's shareholders or to the investing public, and were not accounted for in the books and records of DHB or in DHB's disclosures to the IRS as income to BROOKS.

35.   In June of 2002, BROOKS, acting through one of his non-DHB corporate entities, purchased a Learjet 60 aircraft.   The jet has a capacity of 11 passengers and a flight range of approximately 3,500 miles.   At approximately the time BROOKS purchased the Learjet, the DHB Board passed a resolution authorizing reimbursement for BROOKS' DHB-related use of the jet, up to the amount that a comparable charter flight would have cost.   BROOKS used the plane extensively for personal travel, such as family vacations, as well as for business travel.   No record distinguishing which of BROOKS' flights were business related and which were personal was maintained.   Instead, BROOKS

used DHB funds to pay 100 percent of the expenses of owning and operating the aircraft, including pilots' salaries, benefits and expenses, maintenance and repair of the plane, storage and fuel. While approximately 40 percent of the plane's flights were for BROOKS and his family's personal benefit and completely unrelated to DHB business, DHB paid for all costs related to the operation of the aircraft.

 36. The defendant DAVID H. BROOKS used a DHB corporate American Express card, one of which was issued to his pilot, to pay the plane expenses, or arranged direct payments for plane expenses to be made by DHB or one of its subsidiaries via check or wire transfer. During the years 2002 and 2003, BROOKS caused DHB to spend approximately $400,000 to finance flights by BROOKS and his family on BROOKS' private jet which were personal and unrelated to the business of DHB.

 37. When the defendant DAVID H. BROOKS and his family took vacations using BROOKS' Learjet, BROOKS also used DHB funds to pay for many of the general expenses of those trips, including hotel accommodations, meals and various other expenses. When BROOKS and his family traveled to destinations not accessible by the Learjet, BROOKS charged airplane tickets on DHB charge cards. BROOKS also had checks written from the accounts of DHB or one of its subsidiaries, which he cashed so that he would have money for his personal trips.

38.  In 2002 and 2003, DHB funds were also used to pay the expense of transporting one of BROOKS' children to and from college via the Learjet aircraft, and, on two occasions, DHB funds were used to pay the expense of transporting one of BROOKS' children and her college friends to and from a Halloween party via the Learjet.

39.  Between July 2000 and August 2004, DHB paid in excess of $1 million to finance numerous vacations and personal trips taken by BROOKS and his family.  Those payments were not authorized by BROOKS' employment agreement, were not disclosed to DHB's shareholders or to the investing public, and were not accounted for in the books and records of DHB or in DHB's disclosures to the IRS as income to BROOKS.

40.  That compensation included, but was not limited to:

| DATES of TRAVEL and DESTINATION(S) | REASON FOR TRIP | EXPENSES | APPROXIMATE TOTAL TRIP COST to DHB |
|---|---|---|---|
| May 24 – 28, 2001<br><br>Long Island to Las Vegas and back to Long Island | Family Vacation | Airfare: $3,800<br><br>Bellagio Hotel: $3,000<br><br>Meals and Merchandise: $3,200 | Over $10,000 |

| DATES of TRAVEL and DESTINATION(S) | REASON FOR TRIP | EXPENSES | APPROXIMATE TOTAL TRIP COST to DHB |
|---|---|---|---|
| August 18 – September 2, 2001<br><br>Long Island to Nice, France, Olbia, Italy, Milan, Italy, and back to Long Island | Family Vacation | Airfare: $3,785<br><br>Hotel Byblos: $7,474<br><br>Hotel Cala di Volpe: $27,547<br><br>Floris Coroneo Hotel: $20,300<br><br>Four Seasons Hotel: $3,200<br><br>Louis Vuitton, Guccio Gucci and Boutique Gianni Versace: $5,000<br><br>Travelers Checks: $10,000 | Over $75,000 |
| June 29 – July 17, 2002<br><br>Long Island to Aspen, Los Angeles, Las Vegas, Cabo San Lucas, San Diego, Denver, Boston and back to Long Island | Family Vacation | Learjet: $19,090<br><br>Las Ventanas Hotel: $9,650<br><br>Bellagio Hotel: $11,000<br><br>St. Regis Hotel: $6,500<br><br>Peninsula Hotel: $4,630<br><br>Four Seasons Hotel: $980<br><br>Meals and other charges: $7,100 | Over $58,000 |

| DATES of TRAVEL and DESTINATION(S) | REASON FOR TRIP | EXPENSES | APPROXIMATE TOTAL TRIP COST to DHB |
|---|---|---|---|
| August 28 – September 2, 2002<br><br>Long Island to Las Vegas, Los Angeles, Las Vegas and back to Long Island | Shopping Vacation | Learjet: $17,975<br><br>Shutters Hotel: $3,950<br><br>Bellagio Hotel: $3,335<br><br>Prada, Gucci, Stefano Ricci, Fred Segal and Armani: $15,000 | Over $40,000 |
| October 31 – November 2, 2002<br><br>Atlanta to Madison, Wisconsin and back to Atlanta | Halloween Party Attended by BROOKS' Daughter and friends | Learjet: $17,000 | $17,000 |
| December 21, 2002 – January 4, 2003<br><br>Long Island to Boca Raton, St. Marten, St. Bart's, Las Vegas, Boca Raton and back to Long Island | Family Vacation | Learjet: $22,600<br><br>Guanahani Hotel: $2,000<br><br>Bellagio Hotel: $3,000 | Over $35,000 |
| October 30, – November 2, 2003<br><br>Boca Raton to Atlanta, Wisconsin, Atlanta and back to Florida | Halloween Party Attended by BROOKS' Daughter and friends | Learjet: $14,000<br><br>Hotels: $588<br><br>Car Rental: $214 | Over $14,000 |

| DATES of TRAVEL and DESTINATION(S) | REASON FOR TRIP | EXPENSES | APPROXIMATE TOTAL TRIP COST to DHB |
|---|---|---|---|
| December 23, 2004 - January 1, 2005<br><br>Long Island to Boca Raton, St. Maarten, Boca Raton and back to Long Island | Family Vacation | Learjet: $32,000<br><br>Resort of the World, St. Maarten: $2,000 | Over $32,000 |
| June 26 - July 13, 2005<br><br>Long Island to St. Johns, Shannon, Cannes, Shannon, St. Johns and back to Long Island | Family Vacation | Learjet: $40,000<br><br>Villa Rental: $60,000 | Over $100,000 |
| November 24, 2005<br><br>Boca Raton to Long Island | Transport BROOKS' Mother to Attend BROOKS' Daughter's Bat Mitzvah | Learjet: $5,000 | $5,000 |

"Unused" Vacation Pay

41.     BROOKS also directed DHB personnel to issue him checks compensating him for purportedly "unused" vacation time during the years 2002, 2003, 2004 and 2005, claiming that he did not take a single day of vacation during that entire period.  In

2002, BROOKS was on vacation for 36 days, but he nevertheless collected more than $65,000 for "unused" vacation time that year. The total amount of "unused" vacation pay BROOKS fraudulently obtained during the years 2002 through 2005 is $381,800, as shown below:

| Year | Amount | Date(s) |
|------|--------|---------|
| 2002 | $ 65,400 | July 1, 2002 |
| 2003 | $ 71,400<br>$ 78,000 | February 28, 2003<br>July 1, 2003 |
| 2004 | $ 84,000 | July 6, 2004 |
| 2005 | $ 83,000 | July 1, 2005 |
| **TOTAL** | **$381,800** | |

### Automobiles for BROOKS' Personal, Family and Non-DHB Business Use

42. The defendant DAVID H. BROOKS' July 2000 employment contract provided that DHB would provide BROOKS with a car and driver in New York and Florida. From July 2000 through July 2006, BROOKS leased or purchased numerous luxury cars and trucks at DHB's expense, titled and registered those vehicles in his name, and provided the cars to his wife and daughter. In addition, BROOKS used DHB funds to provide trucks to his non-DHB business interests.

43. For example, from 2000 through 2003, the defendant DAVID H. BROOKS' wife drove a series of leased Mercedes Benz automobiles that were paid for by DHB subsidiary PACA at a cost

of approximately $1,500 per month.  BROOKS also used DHB funds to purchase a Mercedes Benz for one of his children in 2001, at a cost of approximately $50,000, and then used another $17,000 of DHB funds to enable her to trade the car in and upgrade to a new Mercedes in 2003.  The defendant BROOKS used more than $50,000 of DHB funds to purchase trucks and equipment trailers that were used exclusively for the benefit of his non-DHB horse businesses.

44.  In January 2006, the defendant DAVID H. BROOKS was in possession of an armored 2002 Ford Excursion, a 2001 Mercedes Benz, and a 2004 Mercedes Benz titled to one of his children, all of which had been paid for by DHB.  On January 25, 2006, BROOKS used $194,044 of DHB funds to purchase a 2006 Bentley Continental Flying Spur, which he titled and registered in his own name.  Despite the fact that BROOKS' employment at DHB was terminated in July 2006, as of the date of this indictment, BROOKS remains in possession of all of those vehicles.

D.  Obstruction of Justice and False and Fraudulent Proxy Statement

SEC Investigation

45.  The SEC's Enforcement Division began an investigation into DHB in or about March of 2003 after receiving several letters of complaint from U.N.I.T.E., a union seeking to organize workers at the Point Blank facility.  In one of the letters, the union reported that DHB was doing substantial

business with TAP and that TAP was owned by the defendant DAVID

H. BROOKS' wife.  Such related party transactions had not been

disclosed in any of DHB's SEC filings on Forms 10-Q, 10-K, or in

DHB's proxy statement filings.

### DHB's TAP Disclosure

46.  In July of 2003, DHB filed an amended Form 10-K

for the year 2002, signed by BROOKS, disclosing DHB's

relationship with TAP for the first time.  That disclosure read:

> The Company has been purchasing certain
> products, which are components of ballistic
> resistant apparel manufactured and sold by the
> Company from Tactical Armor Products, Inc.
> ("TAP"), a company owned by Terry Brooks, the
> wife of Mr. David H. Brooks. The total of such
> purchases during the years ended December 31,
> 2002, 2001, and 2000 were approximately
> $7,975,000, $2,760,000 and $477,000
> respectively. The unit prices charged by TAP
> have been less than the prices charged to the
> Company by its previous outside suppliers, and
> TAP's products are available on demand. To
> facilitate the delivery and integration of
> these components, beginning in May 2001, the
> Company permitted TAP to manufacture these
> components in a portion of the Company's
> manufacturing facility in Jacksboro, Tennessee,
> for which TAP paid to the Company occupancy
> charges of approximately $39,600 and $26,400
> for the years ended December 31, 2002 and 2001,
> respectively. (The rent paid by TAP is an
> estimated allocable portion of the Company's
> total rent for the entire facility.) Terry
> Brooks also owned another company, US
> Manufacturing Corporation, that received
> revenues of $43,355 from the Company in 2002
> for stitching work but has since been merged
> into TAP. TAP is an approved subcontractor
> under the applicable contracts between the
> Company and the United States federal
> government.

47. The TAP disclosure was inaccurate and incomplete, and the omission of material facts from the disclosure rendered it false and misleading. The central role played by the defendant DAVID H. BROOKS in administering the business affairs of TAP and the assistance he received from DHB executives and employees in doing so was completely omitted from the TAP disclosure. The amended Form 10-K did not reveal that approximately 90 percent of TAP's material costs were financed by DHB, that DHB and its subsidiaries were TAP's sole customers, or that TAP's profit margin during 2003 was over 50 percent, far greater than DHB's. Finally, the disclosure did not include any discussion of TAP's provision of sewing services to DHB or the unique manner in which DHB paid for these services. Unlike DHB's other sewing contractors, to whom DHB paid a fixed price according to the number of items sewn, TAP simply calculated its sewing labor costs and overhead, added a substantial profit, which at times exceeded 50 percent, and billed DHB for that total.

48. In October of 2003, DHB submitted a report to the SEC's Enforcement Division asserting that the non-disclosure of DHB's related party transactions with TAP was an accidental oversight. In fact, DHB's failure to disclose the related party transactions with TAP was part of a deliberate strategy by the defendants DAVID H. BROOKS, SANDRA HATFIELD and others. In preparing materials for DHB's independent auditors in connection

with their audit of DHB's 2002 financial reports, BROOKS and
HATFIELD observed that TAP was on the list of Point Blank's ten
largest vendors.  Together with Jane Doe #1, a DHB executive and
co-conspirator whose identity is known to the Grand Jury, BROOKS
and HATFIELD discussed ways to avoid including TAP on that list,
such as adding PACA and NDL's vendors to the list, or listing
only the five largest vendors.  Ultimately, DHB accounting
personnel provided the auditors with a vendor list that did not
include TAP.

49.  Shortly after the disclosure described above,
BROOKS unilaterally increased the price that TAP charged Point
Blank for armor plates by ten percent, despite the fact that
TAP's labor, overhead and material costs had not increased.

50.  On March 9, 2004, the SEC issued a Formal Order
of Investigation relating to DHB.  During the course of the SEC's
investigation into DHB's relationship with TAP, the attorneys
conducting the investigation became aware that certain payments
made by DHB or its subsidiaries appeared to be for the benefit of
BROOKS or BROOKS' horse interests.  On March 30, 2004, the SEC
issued a subpoena to DHB calling for records reflecting all
compensation paid to DHB's corporate officers, including expense
payments, housing allowances and perquisites.  In discussions
with representatives of DHB, the SEC attorneys made clear that
the primary focus of their interest was BROOKS' compensation.

<u>DHB's Response and Disclosure Regarding BROOKS'</u>
<u>Compensation – The Audit Committee Report and</u>
<u>Proxy Statement</u>

51.  Shortly after DHB received the SEC subpoena
regarding executive compensation, the Audit Committee of the DHB
Board began an investigation into BROOKS' compensation.  On
August 10, 2004, the defendant DAVID H. BROOKS caused a detailed
report to be submitted to the Audit Committee of the DHB Board
("the Audit Committee Report"), analyzing and describing
compensation provided to BROOKS dating back to 1997, and focusing
on BROOKS' use of corporate American Express cards, DHB's payment
of BROOKS' housing expenses, and DHB's payment for BROOKS' use of
his personal aircraft.  The Audit Committee Report was prepared
by the defendant DAVID BROOKS and others acting at his direction.
The report contained numerous supporting exhibits, including
schedules of American Express card charges and payments, flight
records, housing expenses and comparisons with alternative
methods of travel and housing.

52.  The conclusion presented in the Audit Committee
Report was that DHB paid only approximately 2.2 million dollars
of the defendant DAVID H. BROOKS' personal American Express
charges between 1997 and 2003, including approximately 1.6
million dollars of personal charges between 2000 and 2003.
Moreover, the report concluded that these amounts were completely
offset by BROOKS' payment of DHB business expenses for which he
was not reimbursed, including salary BROOKS earned but did not

take for the years 1997 through 2000, as well as other amounts
allegedly due to BROOKS.  The Audit Committee Report concluded
that, despite BROOKS' extensive use of DHB charge cards, once
those charges were offset by allegedly unreimbursed business
expenses that BROOKS paid on behalf of DHB, DHB actually owed
BROOKS more than $900,000.  The report also asserted that BROOKS
had reimbursed DHB for any personal expenses that were paid on
his behalf in 2004.  On August 12, 2004, the DHB Audit Committee
accepted the report.  BROOKS then waived his right to
reimbursement for the remaining amounts of unreimbursed business
expenses he had allegedly incurred, as well as the unpaid salary
from years earlier.

     53.  On September 10, 2004, the Audit Committee Report,
including the exhibits and BROOKS' waiver, was submitted to the
SEC.  On November 24, 2004, DHB filed a proxy statement (the
"Proxy Statement") on EDGAR, an electronic data filing and
retrieval system maintained by SEC, which statement was mailed to
all shareholders of record of DHB.  The Proxy Statement pertained
to DHB's annual meeting and the election of the DHB Board,
scheduled to take place on December 30, 2004.  The Proxy
Statement contained a summary of the conclusions reached in the
Audit Committee Report and disclosed BROOKS' waiver.  As was the
case with the Audit Committee Report, the Proxy Statement falsely
asserted that DHB had paid only $2.2 million of BROOKS' personal
American Express charges between 1997 and 2003.  The Proxy

Statement, like the Audit Committee Report, failed to address DHB's payments for BROOKS and his family's vacations and vehicles. The Proxy Statement's only reference to the millions of dollars paid by DHB for BROOKS' and HATFIELD's personal benefit was a sentence reporting that payments for BROOKS' benefit made by check or wire during that period were for "relatively small amounts." The false conclusion that DHB's payments for BROOKS' personal expenses were more than offset by unreimbursed business expenses paid by BROOKS was also repeated in the Proxy Statement.

54. Both the Audit Committee Report and the Proxy Statement were materially false and misleading, and omitted numerous facts necessary to make the disclosures therein complete and accurate. The defendant DAVID H. BROOKS and others who assisted in the preparation of the Audit Committee Report and the Proxy Statement knowingly excluded from the report and the statement more than $4 million of personal expenses or other compensation received by BROOKS, and falsely inflated by more than $1 million the amount that BROOKS was entitled to be reimbursed for expenses which he allegedly incurred on behalf of DHB.

<u>DHB Payments for the Benefit of BROOKS, his
Family, and his Non-DHB Business Interests Omitted
from or Concealed in the Audit Committee Report
and Proxy Statement</u>

55.    The Audit Committee Report purported to classify

and account for all compensation paid to the defendant DAVID H.

BROOKS, particularly American Express charge card charges made

for personal expenses.  In fact, the report accounted for only a

small portion of BROOKS' unauthorized compensation.

56.    None of the payments made by check or wire

transfer from a DHB bank account or from one of DHB's

subsidiaries were mentioned in the Audit Committee Report.  The

Proxy Statement falsely asserted that "[t]he Company also paid by

check or cash relatively small amounts for other non-business

expenses of Mr. Brooks or his affiliates."  In truth, from July

2000 to August 2004, payments by check or wire totaling more than

$1 million were made by DHB for BROOKS' personal benefit,

including the payments described above.  Those payments were

omitted from the Audit Committee Report and the Proxy Statement

and the payments were never disclosed to the Audit Committee, the

SEC, DHB shareholders or the investing public.

57.    The Audit Committee Report and Proxy Statement

also failed to address the defendant DAVID H. BROOKS' routine use

of DHB funds to finance his vacations and personal travel, either

by paying the expenses of his personal aircraft or by paying for

airfare, hotels, meals and other miscellaneous expenses with DHB

funds.  The cost of BROOKS' personal travel during the period
from July 2000 through August 2004 was well in excess of $1
million.  Indeed, in 2003 alone BROOKS' personal travel cost DHB
in excess of $250,000 in expenditures related to the operation of
the Learjet and in excess of $100,000 in additional expenses such
as hotels and meals.  Similarly, the Audit Committee Report and
Proxy Statement made no disclosure of BROOKS' receipt, as of
August 2004, of $298,000 of "unused" vacation pay to which he was
not entitled.

58.  The Audit Committee Report and the Proxy Statement
also failed to accurately disclose DHB's payment of the personal
expenses of the defendant DAVID H. BROOKS and his family
accomplished via BROOKS and his family's use of American Express
cards paid for by DHB.  While the report and the statement
admitted the payment of approximately $1.6 million of BROOKS'
personal expenses through American Express cards during the
period from July 2000 through December 2003, in truth, more than
$1 million of BROOKS' personal expenses charged to DHB's American
Express cards during that period were not included in that
calculation.

59.  Many of the defendant DAVID H. BROOKS'
personal expenses were misrepresented as being legitimate charges
incurred on behalf of DHB or its subsidiaries.  Those included
BROOKS' use of his American Express Card to pay for horse
vitamins from a company called Supernatural Products.  The

supporting documentation for the Audit Committee Report falsely classified that $100,000 expense as a payment to a vendor for goods received by NDL, not as a personal expense of BROOKS that was paid by DHB. Similarly, BROOKS' use of a DHB American Express Card to pay $20,000 for invitations to his son's Bar Mitzvah was classified in the Audit Committee Report as a business expense related to advertising and, thus, it was also not included in the totals disclosed in the report or the Proxy Statement. As described above at paragraphs 36, BROOKS used DHB American Express cards to pay for cosmetic surgery and acupuncture treatments for family members, BROOKS' country club dues and expensive entertainment equipment for his home, among other expenses. None of those American Express charges were accurately reflected as BROOKS' personal expenses in the Audit Committee Report or in the Proxy Statement. Instead, they were represented to be legitimate business expenses of DHB.

60. The Audit Committee Report and the Proxy Statement were also false and misleading in that they omitted any mention of DHB's purchase or lease of luxury vehicles for the defendant DAVID H. BROOKS and his family, as well as the purchase of trucks and trailers for BROOKS' use in his non-DHB businesses.

61. Also not disclosed in the Audit Committee Report or the Proxy Statement was the defendant DAVID H. BROOKS' use of DHB funds to pay in excess of $100,000 in bonus payments to employees of TAP in 2003, a practice he continued through 2005.

62.   Finally, both the Audit Committee Report and the Proxy Statement falsely asserted that, as of August 2004, the defendant DAVID H. BROOKS had repaid DHB for all personal charges on the DHB American Express card.  In fact, although BROOKS made a payment to DHB in April of 2004, there were numerous charges that BROOKS made on the DHB American Express card during 2004 which he did not repay DHB for, either because he made the charges after his April repayment, or because the expenses were fraudulently classified as legitimate DHB business expenses for which repayment was not necessary.  Included among BROOKS' 2004 personal expenses for which he did not reimburse DHB are the purchase of a flat screen television entertainment system for his home in January 2004 at a cost of over $50,000, and the payment of more than $7,000 for expenses related to his daughter's Manhattan apartment.

> Misrepresentations in the Audit Committee Report
> and Proxy Statement Regarding BROOKS' Entitlement
> to Reimbursement From DHB

63.   In addition to failing to disclose more than $4 million of compensation paid to the defendant DAVID H. BROOKS for the period July 2000 through August 2004, the Audit Committee Report falsely claimed that the defendant DAVID H. BROOKS was entitled to reimbursements that he was not entitled to, and the report contained false and misleading calculations regarding the amounts to which BROOKS was arguably entitled.  For example, the report asserted that when BROOKS used his personal aircraft for

DHB business he was entitled to be paid the difference between the actual cost of the trip (which DHB had paid), and what the trip would have cost if BROOKS had used a comparable charter air service.  In fact, the minutes of the DHB Board meeting at which such reimbursement was authorized specifically provided that DHB "would pay for all business trips related to the business use" of BROOKS' plane, but that the "total cost should not exceed the costs of the typical charter services."  The DHB Board did not authorize payments to BROOKS for costs not actually incurred, as asserted in the Audit Committee Report.

64.  Moreover, the Audit Committee Report used a fraudulently inflated charter rate to calculate the reimbursement amount.  The rate used included $1,000 per day of "waiting time" between legs of round trip flights from New York to Florida, while charter services would not have included such charges.  The Audit Committee's inflated charter rate also included a charge of $500 per night for a flight crew's overnight expenses between flights while charter services would not have included such charges either.  The fictitious "waiting time" charges alone increased BROOKS' supposed unreimbursed airplane expenses for 2002 and 2003 by approximately $220,000.

65.  The Audit Committee Report also falsely alleged that the defendant DAVID H. BROOKS was entitled to be reimbursed for use of his aircraft at the fraudulently inflated charter rate for trips ostensibly related to DHB business when the trips, in

fact, were personal trips taken by BROOKS and his family members.
A schedule attached as an exhibit to the Audit Committee Report
fraudulently classified every single flight taken by BROOKS'
plane as having been for a DHB business purpose, including the
family vacations and BROOKS' daughter's trips to Halloween
parties.  As a result, instead of truthfully reporting that
BROOKS owed DHB approximately $400,000 for personal trips paid
for by DHB, the Audit Committee Report falsely reported that DHB
owed BROOKS $952,797 for unreimbursed expenses he incurred in
connection with his use of the aircraft.

      66.  Another materially false and misleading statement
in the Audit Committee Report was the claim that the defendant
DAVID H. BROOKS spent $20,000 of his personal funds per year,
from 1997 to 2003, on miscellaneous DHB expenses, such as
entertainment and "business development efforts," and that BROOKS
was entitled to reimbursement or to use this amount to offset his
personal charges.  In fact, BROOKS regularly obtained cash
advances for any anticipated DHB expense that could not be
charged to the corporate American Express Card, and he routinely
obtained reimbursement on occasions when he was required to use
his personal funds for a DHB expense.  The total amount that the
Audit Committee Report falsely asserted BROOKS was entitled to
reimbursement for in this category was $140,000.

     E.  Use of the Mails and Wires

      67.  The Proxy Statement, and all of DHB's Annual

Reports on Form 10-K, were distributed to DHB's shareholders
through the United States Mail.  The Proxy Statement, Forms 10-K
and Forms 10-Q were also filed with the SEC through the SEC's
electronic filing system, known as the "EDGAR" system.

III. <u>Insider Trading</u>

68.  Between July 2000 and December 2004, DHB filed
fifteen quarterly reports on Forms 10-Q, four annual reports on
Forms 10-K for the years 2000, 2001, 2002 and 2003, and Proxy
Statements in 2000, 2001, 2002, 2003 and 2004.  During that time
period: (a) the defendants DAVID H. BROOKS and SANDRA HATFIELD
executed the portion of the scheme identified above regarding the
use of fraudulent journal entries to reclassify expenses and the
overvaluation of inventory; (b) the quarterly reports and annual
reports, as well as related press releases and public statements
made by BROOKS, HATFIELD and other senior managers at DHB,
contained materially false and misleading information regarding
DHB's financial results; (c) DHB's true financial results for
that time period were not disclosed to the investing public; (d)
BROOKS' private company, TAP, earned exorbitant profits at DHB's
expense; (e) BROOKS converted in excess of five million dollars
in DHB assets for the benefit of himself, his family and
HATFIELD; (f) DHB mailed to investors the Proxy Statement that
contained numerous materially false and misleading statements and
omitted material facts regarding BROOKS' compensation over the
preceding four years; and (g) BROOKS and HATFIELD's fraudulent

scheme to materially misrepresent DHB's reported financial results, BROOKS and HATFIELD's true compensation, and the circumstances surrounding it, were never disclosed to the investing public.

69.   On or about the dates set forth below, the defendant DAVID H. BROOKS sold shares of DHB stock and generated proceeds as set forth below:

| DATE | TRANSACTION | TOTAL PROCEEDS |
|---|---|---|
| November 29, 2004 | Sale of 3,700,000 shares of D.H.B. Industries, Inc. stock | $69,358,388 |
| December 22, 2004 | Sale of 400,000 shares of D.H.B. Industries, Inc. stock | $7,439,280 |
| December 23, 2004 | Sale of 84,100 shares of D.H.B. Industries, Inc. stock | $1,687,382 |
| December 27, 2004 | Sale of 2,538,744 shares of D.H.B. Industries, Inc. stock | $53,161,299 |
| December 28, 2004 | Sale of 858,267 shares of D.H.B. Industries, Inc. stock | $17,053,765 |
| December 29, 2004 | Sale of 1,916,914 shares of D.H.B. Industries, Inc. stock | $36,613,057 |

70.  On or about the dates set forth below the defendant SANDRA HATFIELD sold shares of DHB stock and generated profits as set forth below:

| DATE | TRANSACTION | TOTAL PROCEEDS |
|------|-------------|----------------|
| November 29, 2004 | Sale of 180,000 shares of D.H.B. Industries, Inc. stock | $3,532,133 |
| December 28, 2004 | Sale of 24,426 shares of D.H.B. Industries, Inc. stock | $482,574 |
| December 29, 2004 | Sale of 65,000 shares of D.H.B. Industries, Inc. stock | $1,277,016 |

COUNT ONE
(Conspiracy to Commit Securities Fraud - BROOKS and HATFIELD)

71.  The allegations contained in paragraphs 1 through 70 are realleged and incorporated as if fully set forth in this paragraph.

72.  In or about and between July 2000 and July 2006, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants DAVID H. BROOKS and SANDRA HATFIELD, together with others, did knowingly and intentionally conspire to execute a scheme and artifice (a) to defraud persons in connection with securities of an issuer with a class of securities that was registered under Section 12 of the Securities Exchange Act of 1934, to wit: the common stock

of D.H.B. Industries, Inc.; and (b) to obtain, by means of false and fraudulent pretenses, representations and promises, money and property in connection with the purchase and sale of securities of an issuer with a class of securities that was registered under Section 12 of the Securities Exchange Act of 1934, to wit: the common stock of D.H.B. Industries, Inc., all in violation of Title 18, United States Code, Section 1348.

(Title 18, United States Code, Sections 1349 and 3551 et seq.)

## COUNT TWO
(Securities Fraud - BROOKS and HATFIELD)

73.  The allegations contained in paragraphs 1 through 70 are realleged and incorporated as if fully set forth in this paragraph.

74.  In or about and between July 2000 and July 2006, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants DAVID H. BROOKS and SANDRA HATFIELD, together with others, did knowingly and intentionally execute a scheme and artifice (a) to defraud persons in connection with securities of an issuer with a class of securities that was registered under Section 12 of the Securities Exchange Act of 1934, to wit: the common stock of D.H.B. Industries, Inc.; and (b) to obtain, by means of false and fraudulent pretenses, representations and promises, money and property in connection with the purchase and sale of securities

of an issuer with a class of securities that was registered under Section 12 of the Securities Exchange Act of 1934, to wit: the common stock of D.H.B. Industries, Inc.

(Title 18, United States Code, Sections 1348, 2 and 3551 et seq.)

COUNT THREE
(Conspiracy to Commit Mail and Wire
Fraud - BROOKS and HATFIELD)

75.  The allegations contained in paragraphs 1 through 70 are realleged and incorporated as if fully set forth in this paragraph.

76.  In or about and between July 2000 and July 2006, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants DAVID H. BROOKS and SANDRA HATFIELD, together with others, did knowingly and intentionally conspire to devise a scheme and artifice to defraud DHB, and to obtain money and property from DHB, by means of materially false and fraudulent pretenses, representations and promises, and for the purpose of executing such scheme and artifice, to (a) place and cause to be placed in a post office and authorized depository for mail matter, matters and things to be sent and delivered by the United States Postal Service, and to deposit matters and things to be sent and delivered by private and commercial interstate carriers, in violation of Title 18, United States Code, Section 1341, and (b) cause writings, signs, signals, pictures and sounds to be transmitted by means of wire

communication in interstate and foreign commerce, in violation of Title 18, United States Code, Section 1343.

(Title 18, United States Code, Sections 1349 and 3551 et seq.)

## COUNT FOUR
### (Mail Fraud – BROOKS and HATFIELD)

77. The allegations contained in paragraphs 1 through 70 are realleged and incorporated as if fully set forth in this paragraph.

78. In or about and between July 2000 and July 2006, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants DAVID H. BROOKS and SANDRA HATFIELD, together with others, did knowingly and intentionally devise a scheme and artifice to defraud DHB, and to obtain money and property from DHB, by means of materially false and fraudulent pretenses, representations and promises, and for the purpose of executing such scheme and artifice, and attempting to do so, on or about November 26, 2004, did cause to be placed in a post office and authorized depository for mail, matters and things to be sent and delivered by the United States Postal Service, to wit: the 2004 DHB Proxy Statement.

(Title 18, United States Code, Sections 1341, 2 and 3551 et seq.)

<u>COUNT FIVE</u>
(Wire Fraud - BROOKS and HATFIELD)

79.  The allegations contained in paragraphs 1 through 70 are realleged and incorporated as if fully set forth in this paragraph.

80.  In or about and between July 2000 and July 2006, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants DAVID H. BROOKS and SANDRA HATFIELD, together with others, did knowingly and intentionally devise a scheme and artifice to defraud DHB, and to obtain money and property from DHB, by means of materially false and fraudulent pretenses, representations and promises, and for the purpose of executing such scheme and artifice, on or about November 24, 2004, did transmit and cause to be transmitted, by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures and sounds, to wit: the electronic filing of DHB's 2004 Proxy Statement through the EDGAR system.

(Title 18, United States Code, Sections 1343, 2 and 3551 <u>et</u> <u>seq</u>.)

<u>COUNTS SIX THROUGH ELEVEN</u>
(Insider Trading: DAVID H. BROOKS)

81.  The allegations contained in paragraphs 1 through 70 are realleged and incorporated as if fully set forth in this paragraph.

82.  On or about the dates indicated below, within the

Eastern District of New York and elsewhere, the defendant DAVID
H. BROOKS, together with others, did knowingly and intentionally
execute a scheme and artifice (a) to defraud persons in
connection with securities of an issuer with a class of
securities that was registered under Section 12 of the Securities
Exchange Act of 1934, to wit: the common stock of D.H.B.
Industries, Inc.; and (b) to obtain, by means of false and
fraudulent pretenses, representations, and promises, money and
property in connection with the purchase and sale of securities
of an issuer with a class of securities that was registered under
Section 12 of the Securities Exchange Act of 1934, to wit: the
common stock of D.H.B. Industries, Inc., in that BROOKS sold
shares of DHB Industries, Inc. stock and generated the proceeds
listed below:

| COUNT | TRANSACTION | TOTAL PROCEEDS | DATE |
|-------|-------------|----------------|------|
| SIX | Sale of 3,700,000 shares of D.H.B. Industries, Inc. stock | $69,358,388 | November 29, 2004 |
| SEVEN | Sale of 400,000 shares of D.H.B. Industries, Inc. stock | $7,439,280 | December 22, 2004 |
| EIGHT | Sale of 84,100 shares of D.H.B. Industries, Inc. stock | $1,687,382 | December 23, 2004 |
| NINE | Sale of 2,538,744 shares of D.H.B. Industries, Inc. stock | $53,161,299 | December 27, 2004 |

| COUNT | TRANSACTION | TOTAL PROCEEDS | DATE |
|-------|-------------|----------------|------|
| TEN | Sale of 858,267 shares of D.H.B. Industries, Inc. stock | $17,053,765 | December 28, 2004 |
| ELEVEN | Sale of 1,916,914 shares of D.H.B. Industries, Inc. stock | $36,613,057 | December 29, 2004 |

(Title 18, United States Code, Sections 1348, 2 and 3551 et seq.)

### COUNTS TWELVE THROUGH FOURTEEN
(Insider Trading: SANDRA HATFIELD)

83.  The allegations contained in paragraphs 1 through 70 are realleged and incorporated as if fully set forth in this paragraph.

84.  On or about the dates indicated below, within the Eastern District of New York and elsewhere, the defendant SANDRA HATFIELD, together with others, did knowingly and intentionally execute a scheme and artifice (a) to defraud persons in connection with securities of an issuer with a class of securities that was registered under Section 12 of the Securities Exchange Act of 1934, to wit: the common stock of D.H.B. Industries, Inc.; and (b) to obtain, by means of false and fraudulent pretenses, representations, and promises, money and property in connection with the purchase and sale of securities of an issuer with a class of securities that was registered under Section 12 of the Securities Exchange Act of 1934, to wit: the

common stock of D.H.B. Industries, Inc., in that HATFIELD sold

shares of DHB Industries, Inc. stock and generated the proceeds

listed below:

| COUNT | TRANSACTION | TOTAL PROCEEDS | DATE |
|-------|-------------|----------------|------|
| TWELVE | Sale of 180,000 shares of D.H.B. Industries, Inc. stock | $3,532,133 | November 29, 2004 |
| THIRTEEN | Sale of 24,426 shares of D.H.B. Industries, Inc. stock | $482,574 | December 28, 2004 |
| FOURTEEN | Sale of 65,000 shares of D.H.B. Industries, Inc. stock | $1,277,016 | December 29, 2004 |

(Title 18, United States Code, Sections 1348, 2 and

3551 et seq.)

COUNT FIFTEEN
(Conspiracy to Obstruct Justice)

85.  The allegations contained in paragraphs 1 through

70 are realleged and incorporated as if fully set forth in this

paragraph.

86.  In or about and between March 2003 and July 2006,

both dates being approximate and inclusive, within the Eastern

District of New York and elsewhere, the defendants DAVID H.

BROOKS and SANDRA HATFIELD, together with others, did knowingly,

intentionally and corruptly conspire to obstruct, influence and
impede an official proceeding, to wit: the SEC Investigation, in
violation of Title 18, United States Code, Section 1512(c)(2).

(Title 18, United States Code, Sections 1512(k) and
3551 et seq.)

## COUNT SIXTEEN
(Obstruction of Justice)

87.  The allegations contained in paragraphs 1 through
70 are realleged and incorporated as if fully set forth in this
paragraph.

88.  In or about and between March 2003 and July 2006,
both dates being approximate and inclusive, within the Eastern
District of New York and elsewhere, the defendants DAVID H.
BROOKS and SANDRA HATFIELD, together with others, did knowingly,
intentionally and corruptly obstruct, influence and impede, and
attempt to obstruct, influence and impede, an official
proceeding, to wit: the SEC Investigation.

(Title 18, United States Code, Sections 1512(c)(2), 2
and 3551 et seq.)

## COUNT SEVENTEEN
(Material Misstatements to Auditors: DAVID H. BROOKS)

89.  The allegations contained in paragraphs 1 through
70 are realleged and incorporated as if fully set forth in this
paragraph.

90.  In or about March 2006, within the Eastern
District of New York and elsewhere, the defendant DAVID H.
BROOKS, being an officer and director of DHB, an issuer with a

class of securities registered pursuant to section 12 of the
Securities and Exchange Act of 1934 and obligated to file reports
pursuant to section 15(d) of the Securities and Exchange Act of
1934, together with others, unlawfully, willingly and knowingly,
directly and indirectly (a) made and caused to be made materially
false and misleading statements; and (b) omitted and caused
others to omit material facts necessary to make statements made,
in light of the circumstances in which they were made, not
misleading, to DHB's independent accountants in connection with
(i) audits, reviews and examinations of the financial statements
of DHB required to be filed under the Securities and Exchange Act
of 1934; and (ii) the preparation and filing of documents and
reports required to be filed with the SEC pursuant to regulations
promulgated by the SEC, in violation of Title 17, Code of Federal
Regulations, Section 240.13b2-2(a).

     (Title 15, United States Code, Sections 78m(a) and
78ff; Title 18, United States Code, Sections 2 and 3551 <u>et</u> <u>seq</u>.)


                                   A TRUE BILL


                            _____

                               FOREPERSON


_____
BENTON J. CAMPBELL
UNITED STATES ATTORNEY
EASTERN DISTRICT OF NEW YORK